# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MICHAEL WALKER,** | : | **CASE NO.  3:07CV1796 (RNC)** |
| *Petitioner* | : | |
| | : | |
| **V.** | : | |
| | : | |
| **WARDEN, STATE OF CONNECTICUT,** | : | **NOVEMBER 10, 2009** |
| *Respondent* | : | |

## <u>RESPONDENT'S OBJECTION TO PETITIONER'S<br>MOTION FOR SUMMARY JUDGMENT</u>

This objection is submitted in opposition to the petitioner's motion for summary judgment filed in the above-captioned proceeding [Doc. # 34].  In this case, the petitioner raises two claims of error.  First, he alleges that his due process rights were violated when the state failed to disclose that it had entered into an agreement with a state's witness, Landon Brown, under which Brown would be released from custody in exchange for providing a statement to police.  As his second ground for relief, he alleges that Brown committed perjury at his 1988 criminal trial.  For the reasons set forth below, the decisions of the Connecticut state courts rejecting his claims are not contrary to, or an unreasonable application of, clearly established federal law.  As a result, the petitioner's claims must fail and he is not entitled to summary judgment.

## I.     DOCUMENTS FORWARDED TO THIS COURT

In support of the respondent's objection, the respondent relies upon the following

documents which were previously forwarded to this Court on or about May 19, 2008, as

follows:

Appendix A   Decision of the Connecticut Appellate Court on appeal
from the decision of the state habeas court; *Walker v.*
Commissioner of Correction, 103 Conn. App. 485,
930 A.2d 65 (2007)

Appendix B   Copy of the Record on appeal

Appendix C   Petitioner's brief on appeal

Appendix D   Respondent's brief on appeal

Appendix E   Petitioner's reply brief on appeal

Appendix F   Petitioner's petition for discretionary review by the
Connecticut Supreme Court

Appendix G   Decision of the Connecticut Supreme Court denying
discretionary review; *Walker v. Commissioner of Correction*,
284 Conn. 940, 937 A.2d 698 (2007)

The respondent now forwards the following additional documents in support of its

objection to the petitioner's motion for summary judgment:

Appendix H   Transcript of state habeas corpus trial held on September 27,
2004

Appendix I   Transcript of state habeas corpus trial held on September 28,
2004

Appendix J   Transcript of state habeas corpus trial held on September 29,
2004

Appendix K   Transcript of state habeas corpus trial held on October 15,
2004

Appendix L    Transcript of state habeas corpus trial held on October 26, 2004

Appendix M    Respondent's Exhibit D at the state habeas corpus trial

Appendix N    Petitioner's Exhibit 38 at the state habeas corpus trial

Appendix O    Petitioner's Exhibit 41 at the state habeas corpus trial

Appendix P    Transcript of 1988 criminal trial

## II.    PROCEDURAL HISTORY

The petitioner was charged with murder in violation of Connecticut General Statutes §§ 53a-54a(a) and 53a-8, conspiracy to commit murder in violation of §§ 53a-54a(a) and 53a-48(a), and assault in the first degree in violation of §§ 53a-59(a)(1) and 53a-8.  After a jury trial held in 1988, he was found guilty on all charges.  On November 10, 1988, he was sentenced to a total effective term of imprisonment of eighty years.  The petitioner appealed.  On March 6, 1990, the Connecticut Supreme Court affirmed the judgment of conviction.  *State v. Walker,* 214 Conn. 122 (1990) (hereinafter "*Walker I*").

Subsequently, the petitioner filed a petition for writ of habeas corpus in state court. *Michael Walker v. Warden, State Prison*, Docket No. CV90-913, Superior Court in the judicial district of Tolland.  In that petition, he claimed that he was denied the effective assistance of counsel at his 1988 criminal trial.  That petition was dismissed by the habeas court.  The petitioner appealed, and his appeal was dismissed by the Connecticut Appellate Court. *Walker v. Commissioner of Correction*, 38 Conn. App. 99 (1995).  On July 17, 1995, the Connecticut Supreme Court denied the petitioner's request for discretionary review. *Walker v. Commissioner of Correction*, 234 Conn. 920 (1995).

3

On December 4, 1996, the petitioner filed a second petition for writ of habeas corpus in state court.  After a trial on the merits of the petitioner's claims, the habeas court denied his petition in a written memorandum of decision dated November 24, 2004.  The petitioner appealed.  On September 4, 2007, the Connecticut Appellate Court affirmed the judgment of the habeas court. *Walker v. Commissioner of Correction*, 103 Conn. App. 485, 930 A.2d 65 (2007) (hereinafter *"Walker II"*).  The petitioner then sought discretionary review by the Connecticut Supreme Court.  On December 5, 2007, that court denied such review.  *Walker v. Commissioner of Correction*, 284 Conn. 940, 937 A.2d 698 (2007).

The petitioner initiated the instant habeas corpus action pursuant to 28 U.S.C. § 2254 on December 6, 2007.

## III.    FACTS UNDERLYING THE CONVICTION

On direct appeal, the Connecticut Supreme Court explained that:

> The record discloses that the defendant and Tracey Fisher[1] were arrested in connection with the death of Thomas Dixon and the wounding of Barrington Solomon.  The shooting occurred on the evening of May 12, 1987.  Dixon and Solomon were seated, conversing on the first floor rear porch of a multiple family dwelling located at 104 Enfield Street in Hartford.  The defendant and Fisher approached the dwelling and fired bursts from a .30 caliber automatic or semi-automatic weapon at the men on the porch.  The shots killed Dixon instantly and severely wounded Solomon.  The shooting was apparently motivated by the defendant's desire to avenge his brother, Robert Walker, who, on a previous occasion, had been shot by Solomon and, as a result, was paralyzed.[2]

---

[1]    "A motion to sever Fisher's trial from that of the defendant was granted and Fisher and the defendant were tried separately.  Fisher was convicted and on appeal to this court his conviction was upheld.  See *State v. Fisher*, 210 Conn. 619, 556 A.2d 596 (1989)." *Walker I,* 214 Conn. 124 n.2.

[2]    "The defendant's brother Robert was shot by Solomon after Robert shot Solomon six times while Solomon sat in his car on a Hartford street." *Walker I*, 214 Conn. at 124 n.3.

At the defendant's trial the state offered Lehman Brown[3] as a witness. Brown testified that he knew the defendant and Fisher and that he had been with them early in the day on May 12, 1987. Thereafter, he said, he had gone to visit a friend, Dion Smith, at her apartment. Brown testified that Smith resided at 98-100 Enfield Street, the premises adjoining 104 Enfield Street where Dixon and Solomon were shot. Brown stated that he had fallen asleep at 98-100 Enfield Street and that upon awakening in the evening he had gone out on a rear porch. While there, he observed the defendant and Fisher come through the back lot behind 98-100 Enfield Street. Fisher was in possession of an automatic weapon. Brown stated that he then saw Fisher scale a fence between the properties and fire a series of shots at the men on the porch. Fisher then returned to where the defendant was standing and handed him the gun. The defendant then fired a burst from the weapon at the porch. Fisher and the defendant then ran from the scene.

Smith, Brown's friend, did not testify in the state's case-in-chief nor did she testify for the defense. After the defendant had rested his case, however, the state called her as a witness on rebuttal. Smith testified that she had known Brown for approximately two and one-half years. She stated that, although she had been with Brown on May 12, 1987, she had never been with him in or near an apartment at 98-100 Enfield Street in Hartford. Smith was not cross-examined by the defendant.

During the state's closing argument to the jury the prosecuting attorney noted that he had called Smith as a witness because he had a duty to see that the defendant received a fair trial and that he was obligated to produce all the relevant evidence whether it helped or hurt the state's case. He then stated that Smith's testimony indicated that the state's witness, Brown, "was probably not on the porch at 100 Enfield Street on the night in question."

*Walker I,* 214 Conn. at 124-25.

## IV.  ARGUMENT

The petitioner raises two claims in his petition. First, he asserts that his due process rights were violated when the state failed to disclose that it had entered into an agreement with a state's witness, Landon Brown, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As his second claim, he alleges that Brown

---

[3]    "Lehman Brown was also known as Landon Brown." *Walker I,* 214 Conn. at 124 n.4.

committed perjury at the 1988 criminal trial.  For the reasons discussed below, the Connecticut courts' decisions denying relief are not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  Therefore, his claims are without merit and his motion for summary judgment must be denied.

### A.     Standard Of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a writ of habeas corpus "may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).[4]  The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta," of the High Court's "decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412, 120 S.Ct. at 1523.

A state court decision is "contrary to" clearly established Federal law if it falls within one of two scenarios.  Under the first scenario, a state-court decision will be contrary to "clearly established precedent if the state court applies a rule that contradicts the governing

---

[4]     Justice O'Connor delivered the opinion of the Court with respect to Part II in which it determined that the Antiterrorism and Effective Death Penalty Act (AEDPA) modified the role played by federal habeas courts in reviewing petitions filed by state prisoners and interpreted § 2254(d)(1).  Justice Stevens delivered the opinion of the Court with respect to Parts I, III, and IV.

law set forth in our cases." *Williams*, 529 U.S. at 405, 120 S.Ct. at 1519.  As for the second scenario, the Court explained that a "state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 406, 1519-20.

If a state-court decision is not "contrary to" Supreme Court precedent, the federal habeas court must determine whether the state court's decision involved an "unreasonable application" of clearly established Federal law.  In so doing, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409, 120 S.Ct. at 1521.  Thus, courts must apply an objective standard.  An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 1522.  "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411, 1522.

Once this standard is applied to the claims raised by the instant petitioner, it becomes clear that federal habeas corpus relief is unwarranted and the petitioner's motion for summary judgment should be denied.

**B.    The State Courts' Resolution of the Petitioner's *Brady* Claim is Not Contrary to, or an Unreasonable Application of Clearly Established Federal Law**

In his state habeas petition, the petitioner claimed that "the state failed to disclose the fact that it had entered into an agreement with its primary witness–Landon Brown, A.K.A. Lehman Brown–whereby the state facilitated the release of the witness from the custody of the Connecticut Department of Correction on a written promise to appear in exchange for the witness giving a statement implicating the defendant in the crimes for which he was convicted." Appendix B at 8. The state habeas court resolved this issue by finding that no "deal" existed. On appeal from that court's decision, the petitioner asserted that the habeas court's facutal finding that no agreement existed was erroneous. Appendix C at 13-15. The Connecticut Appellate Court disagreed. Rather, it concluded "after a careful review of the record, that the habeas court reasonably found that there was no agreement between Brown and the state. . . ." *Walker II*, 103 Conn. App. at 494.

In this Court, the petitioner again challenges the state courts' factual finding that "there was no deal" between the State and Landon Brown. He claims that he can rebut that finding by clear and convincing evidence. Petitioner's Memorandum [Doc. # 34-2] at 8. Specifically, he argues that (1) the state courts made the finding without considering evidence of Landon Brown's false testimony about a New York detainer and (2) that the testimony of Brown's attorney, Thomas Gerard, "constituted clear and convincing evidence of a deal." *Id.* at 8, 11. He then argues that, because there was "a deal," the state's failure to disclose the arrangement constituted a violation of the principles established in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

8

As demonstrated below, the state courts (1) considered all of the evidence before making their findings, (2) accepted the testimony of Brown's attorney when that testimony did not constitute speculation, and (3) reasonably concluded that no agreement existed. For these reasons, the state courts' resolution of the petitioner's claim does not constitute an unreasonable application of clearly established federal law.

### 1.    The decision of the Connecticut Appellate Court

On appeal to the Connecticut Appellate Court, the petitioner claimed "that he was denied due process of law and his right to a fair trial because the habeas court improperly concluded that he failed to prove that the state had suppressed exculpatory evidence in violation of *Brady v. Maryland,* [373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)]." *Walker II*, 103 Conn. App. at 490.   "Specifically, the petitioner contend[ed] that the prosecutor failed to disclose to the defense that [Landon Brown], who was in police custody on charges related to a robbery, had his bond reduced to a written promise to appear in exchange for a written statement against the petitioner." *Id.*  The respondent countered "that the court correctly concluded that the petitioner failed to prove the existence of such an agreement with Brown." *Id.*

On September 4, 2007, the Connecticut Appellate Court resolved the petitioner's claim, as follows:

> At the outset, we state the standards by which we review the petitioner's claims.  The question of whether there existed an agreement between Brown and the state is a question of fact, which we review under the clearly erroneous standard.  See *State v. Floyd,* 253 Conn. 700, 737, 756 A.2d 799 (2000).  "When reviewing the decision of a habeas court, the facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . .  This court does not retry the case or evaluate the credibility

9

of the witnesses. . . .   Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . .  The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony."  (Internal quotation marks omitted.) *Reid v. Commissioner of Correction,* 100 Conn.App. 59, 62-63, 917 A.2d 1001, cert. denied, 282 Conn. 907, 920 A.2d 309 (2007).

Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review.  See *Quintana v. Commissioner of Correction,* 55 Conn.App. 426, 435-36, 739 A.2d 701,cert. denied, 252 Conn. 904, 743 A.2d 614 (1999).  "The conclusions reached by the [habeas] court in its decision to dismiss the habeas petition are matters of law, subject to plenary review. . . .  Thus, [w]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record."  (Internal quotation marks omitted.)  *Wilson v. Office of Adult Probation,* 67 Conn.App. 142, 145, 786 A.2d 1120 (2001).

The following relevant testimony was elicited at the hearing on the petitioner's habeas petition.  Brown recanted the testimony he had given in the petitioner's criminal trial.  He also testified that once he had provided the police with a statement incriminating the petitioner, the charges against Brown "miraculously disappeared."  Brown, however, did not refer to anything specific that was offered or said, instead claiming that "nothing was said in direct fashion, everything was indirect."  Attorney Thomas R. Gerarde, who had represented Brown, testified that his goal would have been to ensure that once Brown gave a statement, he did not return to jail and that he must have received consent to that, but he was just not sure how it happened.  He further testified that he had a specific memory of not getting a promise from then state's attorney, James E. Thomas, for favorable treatment on the criminal charges against Brown.   Gerarde also stated that his notes indicated, "no promises from JET," which he said referred to Thomas. Detective Clyde Mitchell, the police officer who had interviewed Brown, also testified that the police had made no specific promises to Brown. Thomas testified that he could not recall whether he had entered into an agreement

10

with Brown to recommend a written promise to appear in return for his cooperation.

"In [*Brady v. Maryland,* supra, 373 U.S. at 83, 83 S.Ct. 1194] . . . the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  To establish a *Brady* violation, the [petitioner] must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the [petitioner], and (3) it was material [either to guilt or to punishment]."  (Internal quotation marks omitted.)  *Floyd v. Commissioner of Correction,* 99 Conn.App. 526, 533-34, 914 A.2d 1049, cert. denied, 282 Conn. 905, 920 A.2d 308 (2007).

Our Supreme Court has recognized that "[i]mpeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused."  (Internal quotation marks omitted.)  *State v. Monteeth,* 208 Conn. 202, 213, 544 A.2d 1199 (1988); see also *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *State v. Ortiz,* 280 Conn. 686, 717, 911 A.2d 1055 (2006).  The purpose of requiring the state to disclose impeachment evidence to a criminal defendant is "to ensure that the jury knows the facts that might motivate a witness in giving testimony. . ." (Internal quotation marks omitted).  *State v. Paradise,* 213 Conn. 388, 400, 567 A.2d 1221 (1990), overruled in part on other grounds by *State v. Skakel,* 276 Conn. 633, 693, 888 A.2d 985,cert. denied, --- U.S. ----, 127 S.Ct. 578, 166 L.Ed.2d 428 (2006).

A petitioner bears the burden of proving the existence of an agreement between the state or police and a state's witness.  See *State v. Floyd,* supra, 253 Conn. at 737, 756 A.2d 799. Any such understanding or agreement between any state's witness and the state police or state's attorney clearly falls within the ambit of the *Brady* principles. See *State v. Rucker,* 177 Conn. 370, 373, 418 A.2d 55 (1979). An unexpressed intention by the state not to prosecute a witness does not. Id., at 376, 418 A.2d 55. In *State v. Floyd,* supra, at 738-39, 756 A.2d 799, our Supreme Court held that a connection between a witness' willingness to testify and the state's willingness not to oppose a reduction of the witness' bond to a promise to appear did not

necessarily constitute an implied agreement for *Brady* purposes, especially when there was other evidence militating against the existence of such an implied agreement.

In this case, we conclude that the habeas court found, on the basis of the evidence presented, that there was no agreement between the state and Brown within the penumbra of *Brady*.   In his testimony, Brown did not mention anything that was directly said or offered to him. Neither Gerarde nor Thomas could recall whether an agreement had been made with respect to Brown's release on a promise to appear.  Mitchell stated that no promises had been made to Brown.  Although Gerarde and Brown may have hoped or expected to receive something in exchange for Brown's cooperation, such an expectation does not trigger a *Brady* obligation on the part of the state. See id., at 740,756 A.2d 799; *State v. Rucker,* supra, 177 Conn. at 374-75, 418 A.2d 55.

The petitioner additionally refers to the fact that the charges against Brown were ultimately dropped, arguing that the only reasonable inference is that there was a connection between the dismissal of the case and Brown's testimony against the petitioner.  Our Supreme Court has made clear, however, that not every possible connection between a witness' willingness to testify and the state's recommendation with respect to that witness constitutes an agreement within the penumbra of *Brady.  State v. Floyd,* supra, 253 Conn. at 739, 756 A.2d 799.  Furthermore, such an inference, in this case, is belied by Gerarde's testimony, credited by the habeas court, that Thomas did not make any promises with respect to the charges against Brown and by the notation to that effect in Gerarde's case notes.

Because we conclude, after a careful review of the record, that the habeas court reasonably found that there was no agreement between Brown and the state, the petitioner's *Brady* claim fails.

*Walker II*, 103 Conn. App. at 490-94.

2.     **Under AEDPA, the factual findings of both the state trial court and the state appellate court are entitled to a presumption of correction**

In federal habeas corpus proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  "Implicit factual findings are entitled to § 2254(e)(1)'s presumption of correctness as well."  *Lewis v. Horn*, 581 F.3d 92, 111 (3d Cir. 2009).  In assessing the propriety of state court findings, a federal habeas court must recognize that  "[c]redibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing. . . ."  (Citations omitted.)  *Shabazz v. Artuz,* 336 F.3d 154, 163 (2d Cir. 2003).  "Reasonable minds reviewing the record might disagree about" a witness' "credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."   *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

This deference applies to the factual findings of both the state trial court and the state's appellate courts.  *Lewis,* 581 F.3d at 111; *Williams v. Norris*, 576 F.3d 850, 859 (8th Cir. 2009); *Hannon v. Secretary, Dept. Of Corrections*, 562 F.3d 1146, 1150 (11th Cir. 2009); *Brown v. Sermons*, 515 F.3d 1072, 1077 (10th Cir. 2008); *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007); *Tinsley v. Borg*, 895 F.2d 520, 526 (9th Cir. 1990); *Toste v. Lopes,* 701 F.Supp. 306, 308 (D.Conn. 1987).  This is so "[e]ven though the state appellate court is, in a sense, in no better position than [the federal court] to evaluate the state court record. . . ."  *Tinsley*, 895 F.2d at 526.

13

Finally, a federal court may not "use of a set of debatable inferences to set aside the conclusion reached by the state court. . . ." *Rice,* 546 U.S. at 342.  In other words, the mere fact that a different conclusion might be reached through the use of other inferences "does not satisfy AEDPA's requirements for granting a writ of habeas corpus."  *Id.* at 342.

### 3.     The evidence presented at the state habeas trial supports the factual findings made by the state courts

The petitioner claims that the state courts' finding that no agreement existed between the State and Landon Brown constitutes an "unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d)(2).  In support of this assertion, he points to evidence that Brown's bail was reduced on the same day that Brown provided a statement regarding the shooting. Petitioner [Doc. # 1]  at 16 of 24.  He then jumps to the conclusion that Brown was released *in exchange for* his statement.  In so doing, he fails to consider (1) the evidentiary vacuum surrounding these events and (2) that the evidence presented to the state habeas court in 2004 did not establish the existence of an agreement.  Once these factors are considered, the petitioner's attack upon the factual findings of the state courts fails.

The evidence adduced at the state habeas trial established that, on June 2, 1987, Landon Brown was in custody and scheduled to appear in court.[5]  The lawyer who represented Brown on  the pending charges, Attorney Thomas Gerard, met Brown for the first time on June 2, 1987.  At this initial meeting, Brown told Gerard that he could provide

---

[5]     At the state habeas trial, the court admitted Petitioner's Exhibit 17 which was a mittimus dated May 21, 1987 ordering that Landon Brown be transported to court on June 2, 1987.  Appendix I; Transcript (9/28/04) at 5.

the authorities with information about a murder. Appendix I; Transcript (9/28/04) at 17. Gerard then approached Assistant State's Attorney Herb Carlson and learned that the case was assigned to another prosecutor, James Thomas. *Id.* at 18-19. Gerard testified that Thomas made no promises of favorable treatment. *Id.* at 20, 26. Indeed, Attorney Gerard wrote a contemporaneous note that there were "[n]o promises from JET." Transcript (9/28/04) at 21. "JET" stands for James E. Thomas. *Id.* at 21. Despite the lack of promises, Brown provided the police with a written statement implicating the petitioner on June 2, 1987. Although Gerard speculated that he would have sought to have his client released that day, he had no actual memory of these events. Appendix I; Transcript (9/28/04) at 20-21, 26-27. Detective Clyde Mitchell, who interviewed Brown on June 2, 1987, testified that no promises were made to Brown in exchange for Brown's statement. Appendix I; Transcript (9/28/04) at 91.

Landon Brown did appear in court on June 2, 1987. No transcript exists of that court proceeding.[6] Attorney Gerard testified that Brown entered a plea of not guilty and elected a jury trial. He also explained that Brown was released on a promise to appear. No evidence was presented as to why the trial court reduced the bond. Likewise, no evidence was presented regarding the state's position on any motion to reduce the bond–*i.e.*, whether the state recommended or objected to a reduction in Brown's bond.[7]

---

[6]    The court reporter testified that the records were destroyed in 1992. Appendix H; Transcript (9/27/04) at 69-70.

[7]    The prosecutor testified that this type of an agreement would call for the prosecutor to make a recommendation to the court. Appendix K; Transcript (10/15/04) at 13-14.

At that time, however, Brown was only sixteen years old.  He was charged with robbery but his attorney's assessment of the case against Brown was that "those were the kind of charges that I wasn't worried about" because the circumstances surrounding them were of a type that had "a way of fizzling" out.[8]  *Id.* at 27.  In other words, "it was a street robbery where no one was hurt," and "everyone kind of knew who everybody else was," and one of the two witnesses "didn't want anything to do with the case, and he left before the police arrived."  *Id.* at 27.  At the 1988 trial, Landon Brown testified that he received no promises from the prosecution.  Appendix B at 24; Appendix P at 155-56.

The prosecutor, James Thomas, testified that he did not recall whether he entered into an agreement to recommend that Landon Brown be released on a promise to appear.  Appendix J; Transcript (9/29/04) at 55 and Appendix K; Transcript (10/15/04) at 15, 30.  Given that the state habeas trial was held in 2004–*sixteen years* after the petitioner's criminal trial in 1988–such lack of memory should not be surprising.  Thomas' file pertaining to the charges against the petitioner, however, contained no indication of any sort of agreement.  *Id.* at 25-27.

After observing the witnesses and considering all of the evidence, the state habeas court found that no agreement existed.  Specifically, that court concluded "from the testimony of Attorney Thomas Gerarde who represented Landon Brown on his robbery charge, that there never was any sort of deal between the prosecutor and Mr. Brown. . . .

---

[8]     Attorney Gerard's assessment of the case proved accurate and the State entered a nolle prosequi on or about March 1, 1989.  Appendix I; Transcript (9/28/04) at 6; Petitioner's Exhibit 24 reproduced in Appendix O.  Brown testified against the petitioner approximately six months earlier on September 9, 1988.  Appendix P; Transcript at 137, 141. Tracey Fisher was tried and convicted before the instant petitioner's trial commenced.

It is true that Attorney Gerarde wanted to have Mr. Brown released from pretrial confinement . . . .  However, it was the Judge who presided over Mr. Brown's arraignment who set the bond, not the prosecutor."  Appendix B at 23.  The Appellate Court agreed. Given the evidence before the state courts, this finding is not unreasonable.

In conclusion, the question of "[w]hether cooperation agreements exist between the prosecution and its witnesses is a factual determination. . . ."  (Citation omitted.)  *Shabazz v. Artuz*, 336 F.3d 154, 161 (2d Cir. 2003).  Here, the state courts' finding was based upon the evidence presented at the habeas trial--or lack thereof.  Even if this Court might have made a different finding, it must presume that the state court's finding is correct absent clear and convincing evidence to the contrary.  *Shabazz*, 336 F.3d at 161; 28 U.S.C. § 2254(e)(1).  In other words, the "petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.' . . ."  (Citations omitted.)  *Id.*  Because he cannot overcome this presumption, the instant petitioner's attack on the state courts' factual findings must fail.

### 4.    The state courts considered all of the evidence in reaching their conclusions

The petitioner claims that Landon Brown's "New York detainer perjury undermines [the state courts'] factual finding that the petitioner was unable to prove the existence of an implied deal."  Petitioner's Memorandum at 8.  He asserts that such evidence of perjury "greatly strengthens the remaining facts inferring an implied deal, and was apparently never considered, it constitutes clear and convincing evidence to rebut the finding that 'there was no deal.'"  *Id.* at 8-9.  In other words, he argues that the state courts' findings were unreasonable because those courts did not consider certain testimony in reaching

17

those findings.  Before arriving at its conclusions, however, the state habeas court explicitly stated that it considered all of the evidence and the petitioner offers no evidence to the contrary.  Thus, the petitioner's argument must fail.

In 2004, after hearing the witnesses and reviewing the documentary evidence, the state habeas court found that the petitioner failed to prove the existence of an agreement. In so doing, the court noted that "[t]he petitioner called nineteen witnesses on his behalf and introduced twenty-four pieces of documentary evidence.  The Court has reviewed all of the testimony and evidence. . . ."  Appendix B at 15.  Moreover, it acknowledged that "Mr. Brown has clearly engaged in at least one act of perjury."  *Id* at 18.  Thus, the mere fact that the state habeas court failed to mention the "New York detainer" evidence in its written memorandum of decision in no way undermines its factual findings.

Thereafter, the petitioner attacked the state habeas court's finding on appeal.  *See* Petitioner's brief; Appendix C at 13 (petitioner claimed that "[t]he habeas court found that 'there was never any sort of deal between the prosecutor and Mr. Brown.'  This finding is incorrect").  In rejecting this claim, the Appellate Court explained that "Brown did not mention anything that was directly said or offered to him. Neither Gerarde nor Thomas could recall whether an agreement had been made with respect to Brown's release on a promise to appear.  Mitchell stated that no promises had been made to Brown.  Although Gerarde and Brown may have hoped or expected to receive something in exchange for Brown's cooperation, such an expectation does not trigger a *Brady* obligation on the part of the state."  *Walker II*, 103 Conn. App. at 493-94.  The court then concluded "after a careful review of the record, that the habeas court reasonably found that there was no agreement between Brown and the state. . . ."  *Id.* at 94.

18

Thus, the petitioner has failed to demonstrate that the Connecticut state courts did not consider all of the evidence admitted at the state habeas trial. His mere speculation on this issue certainly does not rebut the state court's findings by clear and convincing evidence. For this reason, he cannot show that the factual finding that no agreement existed constitutes an unreasonable determination of the facts.

> **5.    The petitioner's reliance upon Attorney Thomas Gerard's speculation does not rebut the state courts' finding by clear and convincing evidence**

The petitioner also asserts that the factual findings were unreasonable because the state courts ignored some of the testimony of Attorney Thomas Gerard, who represented Landon Brown on June 2, 1987, when Brown provided a written statement to police. *See* Petitioner's Memorandum [Doc. # 34-2] at 9, 11. In reviewing the state courts' treatment of Attorney Gerard's testimony, this Court should recognize that such testimony was divided into two parts–*i.e.*, what Gerard actually remembered and what Gerard speculated occurred seventeen years earlier.[9] An analysis of the decisions of the state courts reveals that the courts only adopted those portions of Gerard's testimony that were corroborated by his contemporaneous notes. Given Gerard's repeated references to his lack of memory–and his propensity to speculate about what may have occurred--such an approach was entirely reasonable.

In his testimony, Gerard explained that he met with Landon Brown for the first time on June 2, 1987. Appendix I; Transcript (9/28/04) at 17. Brown was scheduled to appear in court that day to be arraigned on robbery charges. *Id.* at 15-17. Brown told Gerard that

---

[9]    Attorney Gerard testified on September 28, 2004 about events that occurred on June 2, 1987.

he had information about a murder and was willing to testify.  *Id.*  Gerard then left to speak

with a prosecutor.  *Id.* at 18.  At this point, Gerard stated, "I went, and my recollection I will

confess is not as certain as I am about what I've told you so far."  *Id.* at 18.  Gerard then

testified that:

> A.    My recollection is that I approached Herb Carlson who,
> because I don't think I knew that one of specific prosecutors was assigned
> to this case.  I think I approached Herb Carlson and said, Herb, I have a
> man in the lockup.  He knows something about a murder on Enfield
> Street.  Is there any open murder that you know about or whatever, and
> somehow I learned that Jim Thomas was assigned to this case, and it
> kind of steered over towards Jim Thomas.

> * * *

> Q.    Did you then approach a prosecutor?

> A.    Yes, I, like I say, I spoke to Herb Carlson, and my initial goal
> was to find out if there was an unsolved murder that had recently occurred
> on Enfield Street because that's what Landon was telling me about.  And
> when I found–it got related back to me, I'm not sure if it was by Jim
> Thomas or Herb Carlson, but somehow it got back to me there was an
> interest in interviewing Landon Brown on the part of the Hartford Police
> Department.  So what we did was we got it to the next step, and I know
> that my goal was to basically be with him and kind of usher him through
> this process if that's what he wanted, but there's always two things that
> were important to me.  One was can I get any kind of promise from the
> prosecutor that if he does this, then I'm going to get a good deal on my
> case, and number two is like I said, I wanted him out of jail that day so he
> wasn't going back to the correctional center after having cooperated with
> police and possibly get in trouble.

> What happened is I do have a recollection of speaking to Jim
> Thomas and getting no promise from him with respect to any type of
> favorable treatment on his criminal charge, but I somehow walked away
> with a written promise to appear, and I don't have a memory of the exact

conversation, but my belief is that that was how I got the written promise to appear because eventually Landon Brown went and met with two Hartford Police officers in the presence of one of the State's Attorney's inspectors, and when he was finished signing a statement, we entered not guilty pleas, elected a jury trial, put the case on the trial list, and it kind of went to the bottom of the ocean.

* * *

Q.      Was that the agreement with Jim Thomas?

A.      Well, that was–it was the agreement with the prosecutor's office.  I don't remember speaking with Jim.  Let me say it this way.  **My notes** don't say who I spoke to about a written promise to appear.  **My notes** do say, and if you allow me to refresh my recollection, no promises from JET.  That's James E. Thomas.  And then I spoke to Landon about that, that you don't have any promise, but if you testify, so knowing that, do you still agree to go forward with this, and **my notes** indicate, and I do remember that he said he elected to testify and go forward under those terms, and I am sure that somewhere along this continuum, whether it was Herb Carlson or Jim Thomas, I was saying this boy goes home.  He doesn't go back to jail today if we do this, and I got an agreement.  I got a consent to that.  Just not sure how it happened.

Q.      What happened to the case when you went on the record that day, what happened to the case?

A.      I don't have a clear recollection of exactly how this happened, but we entered not guilty pleas.  We elected a jury trial, and the case was moved immediately to the trial list, which means it bypassed a pretrial conference, and I believe the purpose of that was to just allow nothing to happen to this case while this other process of probable cause hearing against the two men charged with murder was going to take place and he was given a written promise to appear because I have that in my–or **my file** reflects he was given a written promise to appear, and he went home from court.  He did not go back to jail.

21

Appendix I; Transcript (9/28/04) at 19-21.

The state habeas court described Gerard's testimony, as follows:

It was clear to this court from the testimony of Attorney Thomas Gerarde who represented Landon Brown on his robbery charge, that there never was any sort of deal between the prosecutor and Mr. Brown. Attorney Gerard made it clear that there were no promises extended to him by the prosecutor and Attorney Gerard communicated this to Mr. Brown. It is true that Attorney Gerarde wanted to have Mr. Brown released from pretrial confinement because he felt that it might be dangerous for him to remain in custody if word of his cooperation in the prosecution of Michael Walker and Tracey Fisher were to get out. However, it was the Judge who presided over Mr. Brown's arraignment who set the bond, not the prosecutor.

Appendix B at 23.

Thus, it appears that the state habeas court only adopted those parts of Gerard's testimony that were corroborated by his contemporaneous notes. According to Gerard, those notes revealed that (1) the prosecutor, James E. Thomas, made no promises; (2) Gerard informed Brown that there were no promises; (3) Brown decided to go forward despite the lack of promises; and (4) Brown was released on a written promise to appear. Appendix I; Transcript (9/28/04) at 21, 22. Given Gerard's repeated references to his lack of memory, his contradictory testimony,[10] and his propensity to speculate about what may have occurred such an approach was entirely reasonable.

_____

[10]    For example, Gerard stated both "*I do have a recollection of speaking to Jim Thomas* and getting no promise from him with respect to any type of favorable treatment on his criminal charge, but I somehow walked away with a written promise to appear, and I don't have a memory of the exact conversation. . ." and  also testified that *"I don't remember speaking with Jim*. Let me say it this way. My notes don't say who I spoke to about a written promise to appear." Appendix I; Transcript (9/28/04) at 20, 21.

In summary, the state habeas court rejected speculation from a witness, Thomas Gerard, who admitted memory problems and who could not explain how it came to be that his client's bond was reduced by the trial court.  Gerard never indicated that he moved for a reduction of bond and/or that the state consented, objected, or took no position on that reduction.  Certainly, after seventeen years, Attorney Gerard's lack of memory was understandable.  That the state courts were not comfortable relying exclusively on Gerard's poor memory and conjecture, however, is not unreasonable–particularly in light of the fact that his notes indicate that "no promises" were made.  Thus, although the habeas court clearly relied upon those portions of Gerard's testimony that were "corroborated" by his contemporaneous notes, its rejection of Gerard's speculation as to what he "believed" occurred was not unreasonable.  As a result, the petitioner's reliance on Gerard's statement that "I am sure that somewhere along this continuum . . . I was saying this boy goes home" does not rebut the state courts' findings by clear and convincing evidence.  *See* Petitioner's Memorandum [Doc. # 34-2] at 11.  Thus, his challenge to the state courts' finding must fail.

### 6.    The state habeas court's determination that no *Brady* violation existed was *not* an unreasonable application of clearly established federal law

In his state habeas petition, the petitioner claimed that "the state failed to disclose the fact that it had entered into an agreement with its primary witness–Landon Brown, A.K.A. Lehman Brown–whereby the state facilitated the release of the witness from the custody of the Connecticut Department of Correction on a written promise to appear in exchange for the witness giving a statement implicating the defendant in the crimes for

23

which he was convicted."  Appendix B at 8.  The state habeas court resolved this issue after a trial on the merits of the claim by concluding that the petitioner failed to prove the existence of an agreement.  On appeal in the state courts, the petitioner argued that the state habeas court erroneously "concluded that he failed to prove that the state, at his criminal trial, had suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). . . ."  *Walker II*, 103 Conn. App. at 487.  The Connecticut Appellate Court agreed with the conclusion reached by the state habeas court that no agreement existed and, therefore, the petitioner's claim failed.

As previously explained, the state courts' factual determinations were not unreasonable.  Nevertheless, even if the petitioner could demonstrate the existence of an agreement, he would not be entitled to relief.

### a.    *Brady v. Maryland*[11]

The "Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."  *Kyles v. Whitley*, 514 U.S. 419, 436-37, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).  Rather, for the non-disclosure of information to constitute a *Brady* violation, three components must be present: "'[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'  *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)."  *Boyette v. Lefevre*, 246 F.3d 76, 89 (2d Cir. 2001).

---

[11]     *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

To establish prejudice, the petitioner must show that the evidence was material. *Strickler*, 527 U.S. at 282, 119 S.Ct. at 1948. Evidence is considered "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. at 433, 115 S.Ct. at 1565; *United States v. Payne,* 63 F.3d 1200, 1209 (2d Cir. 1995). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566; *Payne*, 63 F.3d at 1209. A *Brady* inquiry is not based on the sufficiency of the evidence. Rather, the question is whether the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290, 119 S.Ct. at 1952.

> **b.    Even if an agreement existed, it was not material because it was cumulative to other evidence impeaching Landon Brown**

The petitioner claims that a *Brady* violation occurred when the state failed to disclose that an agreement existed between the State and its witness, Landon Brown. *See Walker II*, 103 Conn. App. at 490. The state courts resolved this claim on the ground that there was no such arrangement. Even if an agreement existed, however, the petitioner still could not establish a *Brady* violation because such an arrangement would not have been material under the circumstances of his case. For this additional reason, the petitioner's summary judgment motion must be denied.

As previously indicated, evidence is considered "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. at 433, 115 S.Ct. at

25

1565; *United States v. Payne,* 63 F.3d 1200, 1209 (2d Cir. 1995).  Thus, "'[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.' . . ."  (Citations omitted.)  *Shabazz*, 336 F.3d at 166.

In 1988, Landon Brown's testimony was attacked on numerous grounds.  Prior inconsistent testimony was revealed, prior convictions were shown, and pending charges were exposed.  Brown acknowledged that he did not tell the police about the shooting until after he was arrested on a robbery charge.  Appendix P; Transcript at 155, 178-80.  He admitted that those charges were still pending and that he was awaiting trial.  *Id.* at 156.  He admitted that he was on parole and probation at the time of the shooting and at the time of his testimony.  *Id.* at 156, 180-81.  At the time that he gave his statement, he was on probation with two years "hanging over his head" as a result of a conviction for "carrying a dangerous weapon or shooting" or "threatening."  *Id.* at 156, 184-85.  When defense counsel expressed doubt that Brown had not been given any consideration by the state, Brown stated, "Believe what you want."  *Id.* at 193.  Finally, he was impeached with prior inconsistent testimony.  *Id.* at 166-72, 191-92.

Moreover, even the *State* impeached Landon Brown when it presented evidence that he could not have viewed the shooting from his girlfriend's apartment, as he testified.  Specifically, the State presented the testimony of Brown's girlfriend, Dion Smith, who refuted Brown's testimony that he was with her when he viewed the shooting from the back porch of the second floor at 98-100 Enfield Street.  Appendix P; Transcript at 145-49, 160-

61.  Smith explained that she had never been with Brown at an apartment at or near 100 Enfield Street.  *Id.* at 389.  The petitioner's attorney presented similar evidence through the testimony of Desrene Taylor and her daughter, Antoinette Taylor.  Both testified at the criminal trial that they lived in the second floor apartment at 100 Enfield Street at the time of the shooting.  *Id.* at 339, 343-44.  Both maintained that they did not know Landon Brown or his girlfriend, Dion Smith, and that neither Brown nor Smith were in their apartment on the evening of May 12, 1987.  *Id.* at 341, 345.  During closing arguments, the prosecutor stated, "I don't know why Mr. Brown lied about what he did, whether he was there or not and whether he saw what he saw is up to you. . . ."  *Id.* at 398.  Later, the petitioner's attorney noted that the prosecutor "has pretty much conceded that Landon Brown is a liar"  and "already indicated to you that Mr. Brown was a liar."  *Id.* at 404, 406.

> ### c.  Even if an agreement existed, it was not material because Landon Brown's testimony was corroborated by other evidence

Finally, even if an agreement existed, it would not be material because Landon Brown's testimony was corroborated by other evidence.  Indeed, a "new trial is generally not required when the testimony of the witness is 'corroborated by other testimony. . . .'"  (Citation omitted.)  *Payne*, 63 F.3d at 1210.  *See also Strickler*, 527 U.S. at 289-96, 119 S.Ct. at 1952-55 (suppressed impeachment information was not material where other evidence corroborated the witness's testimony and supported the defendant's guilt); *United State v. Risken,* 788 F.2d 1361, 1375 (8th Cir. 1986).

Here, the petitioner had a strong motive for the shooting.  In an earlier incident, one of the victims, Barrington Solomon, shot the petitioner's brother, Robert "Bobby" Walker, leaving him paralyzed.  Appendix P; Transcript at 43-45, 50-51, 68.  The petitioner's girlfriend, Sandrina Freeman, told the police that "after Bobby Walker was shot, I used to go and visit Bobby in the hospital almost every day and sometimes with Michael.  Michael used to tell me all the time that he wouldn't be right unless he got the guy back that shot his brother."  *Id.* at 280.

On the day of the shooting, May 12, 1987, Solomon was released from jail after posting bond.  Appendix P; Transcript at 20, 46, 73.  After arriving home around 8:00 p.m, Solomon was outside and observed *the petitioner,* Tracey Fisher, and another individual in a car.  *Id.* at 46, 48-49, 51.  They were driving up a driveway towards the back of Solomon's residence at 104 Enfield Street where Solomon parked his car.  *Id.* at 48-49, 77-81.  When he saw them in the car, Solomon told the other victim, Thomas Dixon, "there goes my enemies."  *Id.* at 50.  He "knew something was going to happen by the way they looked at me."  *Id.* at 87.  Shortly thereafter, Solomon heard shots and "felt a shot in [his] belly."  *Id.* at 52.

Next, it is critical to understand that Brown was not the only person who saw the petitioner at the crime scene at the time of the shooting.  While the petitioner raised an alibi defense,[12] Brown and one other witness placed the petitioner in the area of the shooting

---

[12]    The petitioner's brother, Robert Walker, who had been shot by Barrington Solomon on an earlier occasion testified that the petitioner arrived home at approximately 8:30 p.m. and then left around 8:55 p.m. to pick-up their sister, Gwendolyn Walker, from

(Continued...)

at the time of the shooting.  Brown testified that after the shooting, the petitioner and Fisher ran towards Garden Street.  Appendix P; Transcript at 151.  Nadine Collier was at her home on Garden Street on the night of the shooting.  *Id.* at 203.  She heard two series of shots.  *Id.* at 203-04.  Seconds later, she looked out her kitchen window and saw a man she knew to be Tracey Fisher.  *Id.* at 204-06, 210.  Fisher was holding a gun and was accompanied by another man.  *Id.* at 206.  Collier moved to her living room window and saw the other man pass by the window.  *Id.* at 206-10.  She  recognized him to be the petitioner.  *Id.* at 207-08, 210.  In 1988, Collier testified that she had known the petitioner, Michael Walker, "all my life."[13]  *Id.* at 208.

---

[12]    (...continued)

her place of employment in Bloomfield.  Appendix P; Transcript at 348-56.  Robert stated that the petitioner and Gwendolyn returned home around 9:35 p.m.  *Id.* at 353.  Gwendolyn corroborated Robert's testimony and added that before returning home, she and the petitioner gave a ride to her co-worker, Evelyn Epstein.  *Id.* at 358-70.  Epstein testified that the petitioner and Gwendolyn had given her a ride home one evening, but she could not recall the date of that event.  *Id.* at 374-81.

[13]      The petitioner makes much of the fact that Nadine Collier "also has recanted in court under oath. . . ."  Paragraphs 5 through 9 and 23 of Ground Two of Petition [Doc. # 1].  In her 1988 testimony, however, Collier explained her fears about testifying.  She had been threatened, followed, and photographed.  Appendix P; Transcript at 223, 224.  Her mother suffered a stroke and a heart attack "over all of this.  She asked me and pleaded with me not to come to court, but I came to court, because I did see. . . .  You think I am not scared, I am sitting [here] trembling now just sitting and looking at him."  *Id.* at 224.

Despite the fact that she was subpoenaed, Collier did not appear at the petitioner's state habeas trial in 2004.  Appendix L; Transcript (10/26/04) at 25-29.  Rather, a transcript of her testimony at an earlier habeas trial in which the petitioner attacked a *different*

(Continued...)

Another witness, Regina Tillis, corroborated Brown's testimony that his cousin, Tracey Fisher, was involved in the shooting. Tillis, who also lived on Garden Street, testified that she heard "booming noises" that "sounded like a gun going off." *Id.* at 232. Almost immediately thereafter, she looked out her window and saw a man in possession of a gun. *Id.* at 233. She identified that person as Tracey Fisher. *Id.* at 235.

Other significant evidence corroborated Brown's testimony. For example, Brown testified that Fisher fired a series of shots and then gave the gun to the petitioner who, after several seconds, fired another series of shots toward the same porch as Fisher. Appendix P; Transcript at 150-51. This information was corroborated by Janet Douglas who lived with Solomon at 104 Enfield Street and testified that she heard two sets of "noises. It sounded like firecrackers." *Id.* at 22-23. The noises "kind of stopped" but as Barrington Solomon pushed his way into her home, "the noises started back up again." *Id.* at 22-23. Solomon was "holding his side and blood was dripping." *Id.* at 23. A Hartford police officer, John Cunningham, also testified that he heard "two bursts of automatic gun fire" coming from

---

[13]    (...continued)

conviction for murder was admitted over the respondent's objection. *Id.* at 28-29. That transcript is forwarded to this Court as Appendix N. In that testimony, Collier (1) denied that she saw the petitioner on the night of the shooting and (2) denied that she testified that she saw him at the 1988 trial. In its decision on the petitioner's prior habeas petition, the first habeas court--which heard Collier's live testimony--found that "Collier's habeas testimony was not credible. At the habeas hearing Collier flatly denied or contradicted much of her testimony in the Enfield Street case although the questions asked were taken straight from the transcript of that case." *See Michael Walker v. Warden, State Prison*, Docket No. CV90-911, Superior Court in the judicial district of Tolland; 2000 WL 1658504 at *19 (Conn.Super. 2000).

the direction of Enfield Street.  *Id.* at 95.  Cunningham estimated that the first and second "bursts" were separated by five or six seconds.  *Id.* at 96.

Similarly, Brown testified that Tracey Fisher went to the fence that divides 98-100 Enfield Street from the building next door.  Appendix P; Transcript at 147-48.  Fisher began shooting at the first floor porch of 102-104 Enfield Street.  This is corroborated by the fact that shell casings were recovered from the backyard of 98-100 Enfield Street near the fence that separates 98-100 Enfield Street from 102-104 Enfield Street.  *Id.* at 120, 128. A second set of shell casings were also recovered.  *Id.* at 122.

Likewise, Brown testified that he saw the petitioner and Tracey Fisher in possession of a small automatic weapon at the time of the shooting.  Appendix P; Transcript at 147. This is corroborated by the fact that the shell casings recovered at the crime scene were the type that are used in automatic or semi-automatic weapons.  *Id.* at 119, 131.

Given these circumstances, the slight additional impeachment value of an agreement to release Brown from custody in exchange for his statement would not have changed the result of the proceedings.  The jury was aware that Brown still faced criminal charges.  His testimony, however, was corroborated by both physical evidence and the testimony of other witnesses.  As a result, no reasonable probability exists that the result of the proceeding would have been different with the addition of this minor fact.  Thus, the petitioner's claim is without merit and his motion for summary judgment must be denied.

C.    **The State Habeas Court's Determination That The Petitioner Failed To Demonstrate That The State Presented Perjured Testimony Is Not An Unreasonable Application of Clearly Established Federal Law**

As his second claim for relief, the petitioner asserts that he "was denied a fair trial because the prosecutorial team knew or should have known that Brown's testimony was perjury, and its absence would probably have changed the verdict."  Petition [Doc. # 1] at 17 of 24.  Specifically, he asserts that Landon Brown's 1988 testimony was false because Brown lied about (1) "seeing the petitioner commit the crimes for which he was being tried"; (2) "being where he claimed to be when he supposedly saw the petitioner committed the crimes for which he was being tried"; and (3) "his custodial status at the time that he gave a statement implicating the defendant in the crimes for which he was convicted."  The petitioner's motion for summary judgment, however, is based solely upon the third allegation–*i.e.*, the Landon Brown lied about his custodial status at the time that he gave his written statement to police.  Even if false, Brown's 1988 testimony on this point cannot be considered material and, therefore, his claim must fail.

1.    **Facts underlying the petitioner's claim**

The petitioner moves for summary judgment on his claim that Landon Brown lied that he was in custody because of a New York "hold."  The testimony that the petitioner alleges to be false is confusing but seems to have begun during the petitioner's cross-examination of Brown, as follows:

Q.    Isn't it true that it was not until you yourself were taken into custody by the police on these pending robbery charges that you told the police the information that you have testified to today?

A.    I made bond.

32

Q.    Well, didn't you tell them what you testified to today regarding Tracey and Michael after you were incarcerated?

A.    But I made bond, so it didn't matter.

Q.    That is not my question, Mr. Brown.  My question, did you not tell the police and give that statement while you were, in fact, in custody on this robbery charge that is now pending today?

A.    You could say that, but–

* * *

Q.    So, your testimony today is that you were not, in fact, in custody when you gave the police the statement?

A.    I was, but I wasn't–

Q.    Well, I think I am a little confused.  My question, Mr. Brown, were you or were you not in custody when you gave the statement that you gave to the police?

A.    Yes.

Q.    You were in custody?

A.    Yes.

* * *

Q.    You want us to believe that they have not offered you any favorable consideration for your own case for your testimony against Tracey Fisher and Michael Walker, is that what you are telling us?  Yes or no.

A.    Believe what you want.

Q.    Indeed, I will Mr. Brown.

Appendix P; Transcript at 178-79.

33

On re-direct examination, Brown testified, as follows:

> Q.     You also indicated you were in a little bit of trouble with respect to custody.  I think [the petitioner's attorney] was saying that you were in custody on the charges of robbery and you were indicating that you had made bond?

> A.     Yes.

> Q.     You had another hold on you, though?

> A.     Yes.

> Q.     And what was that hold for?

> A.     It was a hold from New York, I think.  I am not sure.

> Q.     And that related to a violation of probation or other proceedings?

> A.     Yes, something completely different in New York.

> Q.     So, you were not being held at that time on the robbery charges?

> A.     No.

> Q.     Under bond?

> A.     No.  New York was holding me.

Appendix P; Transcript at 194-95.

### 2.    The Connecticut Appellate Court's decision

On appeal, the Connecticut Appellate Court resolved the petitioner's claim, as follows:

> The petitioner's third claim is that the habeas court improperly concluded that his due process rights were not violated by the state's presentation of Brown's perjured testimony. Specifically, the petitioner argues that the court's determination that Brown's testimony at the habeas trial was unworthy of belief and that his testimony at the petitioner's criminal trial was true in all material respects is clearly erroneous. The petitioner's claim is unavailing.
>
> The question of whether a witness perjured himself is a factual finding, which we review under the clearly erroneous standard.  See *Ortega v. Duncan,* 333 F.3d 102, 107-108 (2d Cir.2003).  When the factual basis of the court's decision is attacked, "[w]e are called upon to determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous  . . .  Our function is not to examine the record to see if the trier of fact could have reached a contrary conclusion."  Internal quotation marks omitted.) *Morales v. Commissioner of Correction,* 99 Conn. App. 506, 509, 914 A.2d 602,cert. denied, 282 Conn. 906, 920 A.2d 308 (2007).  The United States Court of Appeals for the Second Circuit has made clear that in order to determine whether perjury occurred, "the court must weigh all the evidence of perjury before it, including but not limited to the recantation. . . ."  *Ortega v. Duncan,* supra, at 107.  Thus, the court must go beyond the recantation to review other independent evidence bearing on whether there was perjury at trial.
>
> We conclude that the court's findings with respect to the credibility of Brown's trial testimony and his recantation find ample support in the record and are therefore not clearly erroneous.  The court based those findings on the detailed nature of the statement that Brown had given the police, the consistency between that statement and his trial testimony, and the fact that Brown's testimony was corroborated by other witnesses at the trial.  The court also noted Brown's potential motives to lie at this stage, including the fact that his testimony at the trial of his cousin, Fisher, had caused a rift in

the family and that Brown was incarcerated at the department of correction and subject to direct pressure that could be brought to bear on him by the petitioner. Finally, the court found it significant that Brown did not come forward with his recantation until approximately eight years after his original trial testimony, which was long after the statute of limitations for a perjury prosecution had passed.

The petitioner directs us to evidence favorable to his claim and urges us to conclude, on the basis of this evidence, that the habeas court's finding was clearly erroneous. That we cannot do. First, the habeas court acted well within its discretion in finding that Brown's trial testimony was generally truthful despite some discrepancies. See *State v. Hoyeson,* 154 Conn. 302, 305, 224 A.2d 735 (1966) ("a trier [of facts] is entitled to credit some portions of a witness' testimony and discredit other portions"). Furthermore, the fact that there is support in the record for a different conclusion is irrelevant at this stage in the judicial process. As we have noted, we do not review the evidence to determine whether a conclusion different from the one reached could have been reached. We review the totality of the evidence, including reasonable inferences therefrom, to determine whether it could support the trier's decision. See *Morales v. Commissioner of Correction,* supra, 99 Conn. App. at 509, 914 A.2d 602. We conclude that it does.

(Footnotes omitted.)  *Walker II,* 103 Conn. App. at 498-500.

### 3.    Even if false, Landon Brown's testimony about a New York "hold" was not material

Here, the petitioner presented the Connecticut Appellate Court with a claim that the state habeas court erred in concluding that Landon Brown was truthful in all material respects. Appendix C; Petitioner's Brief at 25. In attacking this conclusion, the petitioner asserted that Brown lied when he testified that he (1) did not receive any consideration for his statement and (2) remained in custody on a New York detainer. *Id.* at 25-26. These two "lies," he contended, "severely [undercut] the credibility of his remaining testimony at trial, while substantially bolstering his recantation." *Id.* at 26. Now, however, he limits the

36

perjury claim in his motion for summary judgment to Brown's testimony about a New York "hold." Indeed, he does not claim that Brown's testimony about viewing the shooting or his testimony that the petitioner was one of the shooters was false.**14** Likewise, he does not allege that Brown's recantation was truthful. Because Brown's testimony at the petitioner's 1988 criminal trial about a "hold" was not material, the petitioner is not entitled to summary judgment.

When a conviction is based, in part, upon perjured testimony, the Supreme Court of the United States has held that such "conviction must be set aside if (1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)." *Drake v. Portuondo,* 321 F.3d 338, 345 (2d Cir. 2003). Similarly, the Second Circuit has held that "a showing of perjury at trial does not in itself violate due process warranting habeas corpus relief. . . ." (Citation omitted; emphasis added.) *Duncan v. Ortega,* 333 F.3d 102, 108 (2d Cir. 2003). Rather, due process is violated only 'if the [false] testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely *not* have been convicted."'" (Emphasis added.) *Duncan,* 333 F.3d at 108.

Here, the petitioner asserts that the false "New York hold" testimony is material because, had Brown's lie been revealed, "it would almost certainly have destroyed Brown's credibility." Petitioner's Memorandum [Doc. # 34-2] at 14. In support of this contention he

---

14    No doubt that claim will be briefed later in this habeas corpus proceeding.

37

argues that the "New York hold" testimony was material[15] because "[b]oth common sense and Supreme Court precedent tell us that direct contradiction of a fact carries greater weight than other types of impeachment."  Petitioner's Memorandum [Doc. # 34-2] at 14. He then maintains that information that the "New York hold" testimony was false "would have provided the only 'direct' contradiction of [Brown's] testimony. . . ." *Id.* at 14.  Contrary to such assertion, Brown's testimony *about the shooting* was "directly" contradicted. Obviously, that contradiction was much more important than any impeachment relating to his custodial status.  Thus, Brown's testimony about his custodial status was not material.

At the 1988 criminal trial, Landon Brown testified that he viewed the shooting from the rear porch of the second floor apartment at 98-100 Enfield Street.  Thereafter, both the State and the defense presented evidence to the jury that Brown was not on that porch on May 12, 1987.  Specifically, the State presented the testimony of Brown's girlfriend, Dion Smith, who refuted Brown's testimony that he was with her when he viewed the shooting. Appendix P; Transcript at 145-49, 160-61. Smith explained that she had never been with Brown at an apartment at or near 100 Enfield Street.  *Id.* at 389.  The petitioner's attorney presented similar evidence through the testimony of Desrene Taylor and her daughter, Antoinette Taylor.  Both testified at the 1988 trial that they lived in the second floor

---

[15]    In other parts of his memorandum, however, the petitioner argues that the "prosecution's failure to correct the perjury was . . . material."  Petitioner's Memorandum [Doc. # 34-2] at 15.  He also asserts that "[u]nlike many types of impeachment information, in this case the reviewing court need not make a single assumption about whether the potential for cross examination would have been realized, whether the jurors would have found impeaching testimony by another witness credible, or even how they might have interpreted the impeaching evidence.  Minimal investigation by the prosecution . . . would have directly revealed the falsity of this statement."  *Id.* at 14.

apartment at 100 Enfield Street at the time of the shooting.  *Id.* at 339, 343-44.  Both maintained that they did not know Landon Brown or his girlfriend, Dion Smith, and that neither Brown nor Smith were in their apartment on the evening of May 12, 1987.  *Id.* at 341, 345.  During closing argument, the prosecutor stated, "I don't know why Mr. Brown lied about what he did, whether he was there or not and whether he saw what he saw is up to you. . . ."  *Id.* at 398.  Later, the petitioner's attorney noted that the prosecutor "has pretty much conceded that Landon Brown is a liar" and "already indicated to you that Mr. Brown was a liar."  *Id.* at 404, 406.

Brown also was impeached in several other ways.  The jury learned that Brown had robbery charges pending, that he had two years of a suspended sentence "hanging over his head," and that the sentencing judge in one of Brown's pending cases may have known about his cooperation with the police.  Appendix P; Transcript at 182-86, 192.  Brown also was repeatedly impeached with his prior testimony at Tracey Fisher's trial.  Thus, the jury was aware that Brown was not the most credible of witnesses.

Finally, Brown's testimony about the "New York hold" was not material because his testimony about the shooting was corroborated by other witnesses and physical evidence.  A recitation of the evidence corroborating Landon Brown's testimony is contained in Section IV.B.6.c., above.  That evidence shows that the petitioner had a significant motive to shoot Solomon.  He repeatedly told his girlfriend that "he wouldn't be right unless he got the guy back that shot his brother."  The petitioner was seen in the driveway of Solomon's residence shortly before the shooting and was observed in the area immediately after the shooting.  His co-defendant, Tracy Fisher, who was Landon Brown's cousin was identified by two additional witnesses as (1) in the area at the time of the shooting and (2) in

possession of a weapon.  Given that evidence, this Court cannot find "that but for the perjured testimony, the defendant would most likely not have been convicted." *Duncan,* 333 F.3d at 108.  *See also United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (conviction must be set aside if there is a "reasonable likelihood" that the state's knowing use of perjury "could have affected the judgment of the jury"). In other words, because the State presented a vast amount of evidence corroborating Brown's 1988 testimony, there is no likelihood that evidence contradicting Brown's testimony about a "New York hold" would have changed the outcome of the proceeding. As a result, the petitioner's claim fails and his summary judgment motion must be denied.

## V.    CONCLUSION

For the reasons set forth above, the respondent requests that this Court deny the petitioner's motion for summary judgment.

Respectfully submitted,

RESPONDENT–WARDEN

By:    ____/s/_____
JO ANNE SULIK
Senior Assistant State's Attorney
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, Connecticut 06067
(860) 258-5887
E-mail: JoAnne.Sulik@po.state.ct.us
Fed. Bar. No. ct 15122

## **CERTIFICATION**

I hereby certify that a copy of this objection is being mailed to Attorney Jennifer Vickery, P.O. Box 1281, New Haven, Connecticut 06505, (203) 809-0223, on November 11, 2009.

_____/s/_____
JO ANNE SULIK
Senior Assistant State's Attorney